**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

TINA L. HAWKINBERRY,              )   CASE NO. 5:12-cv-0703
                                 )
    Plaintiff,                 )
                                 )   MAGISTRATE JUDGE VECCHIARELLI
        v.                  )
                                 )
COMMISSIONER OF SOCIAL SECURITY  )
ADMINISTRATION,             )   MEMORANDUM OPINION
                               )
    Defendant.               )

This case is before the magistrate judge by consent of the parties.  Plaintiff, Tina L. Hawkinberry ("Hawkinberry"), challenges the final decision of the Commissioner of Social Security ("Commissioner"), denying Hawkinberry's application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i). This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the opinion of the Commissioner is AFFIRMED.

I.  Procedural History

Hawkinberry filed an application for DIB on November 21, 2008, alleging disability as of January 21, 2006.  In her application, Hawkinberry complained of disability due to depression, chronic obstructive pulmonary disease ("COPD"), arthritis, sleep apnea, and spinal problems.

Hawkinberry's application was denied initially and upon reconsideration.  She

timely requested an administrative hearing.

Administrative Law Judge Scott Kidd ("ALJ") held a hearing on June 14, 2011. Hawkinberry, represented by counsel, testified on her own behalf.  Mark Anderson testified as a vocational expert ("VE").  The ALJ issued a decision on June 29, 2011, in which he determined that Hawkinberry was not disabled within the meaning of the Act. Hawkinberry requested review of the ALJ's decision by the Appeals Council.  When the Appeals Council declined further review on January 24, 2012, the ALJ's decision became the final decision of the Commissioner.

Hawkinberry filed an appeal to this court on March 22, 2012.  Hawkinberry alleges that the ALJ erred because substantial evidence does not support the ALJ's determination that Hawkinberry can perform substantial gainful activity.  The Commissioner replies that the ALJ's opinion is fully supported by substantial evidence.

## II.  Evidence

### A.    Personal and Vocational Evidence

Hawkinberry was born on January 1, 1969 and was 39 years old on her alleged onset date of January 21, 2008.  Hawkinberry has a high school degree and past relevant work as a sash builder.

### B.    Medical Evidence

From May 30, 2007 through April 4, 2008, Nicholas Varrati, M.D., treated Hawkinberry for a shoulder and neck injury suffered at work.  Tr. at 227-42.  According to Hawkinberry, she worked lifting panes of double-strength glass, and by the end of the day she was aching.  This developed into pain between her shoulder blades on the left side of the neck, with pain radiating down her left arm.  An MRI of the cervical spine on

2

June 15, 2007 revealed multilevel discovertebral abnormalities at C3-C4 and to a somewhat lesser extent at C4-5.  Tr. at 260.  It also revealed disc protrusions-extrusions at both levels affecting the spinal cord.  A nerve conduction study conducted on July 27, 2007 indicated moderate carpal tunnel syndrome on the left side.  Tr. at 258.  Dr. Varrati initially restricted Hawkinberry to work lifting no more than five pounds, and prescribed medications.  In addition, Hawkinberry participated in physical therapy.  Throughout the course of treatment, Hawkinberry complained of pain and exhibited paraspinal tenderness and varying degrees of restriction in ranges of motion in her neck and upper back.

On October 1, 2007, Hawkinberry underwent a pulmonary function study.  Tr. at 360-62.  The study indicated that she had obstructive lung disease and that she had relatively small response to a bronchodilator.  The physician interpreting the results wrote that Hawkinberry "[m]ust quit smoking."  Tr. at 360.  Ramana Podugo, M.D., repeated this advice on December 8, 2010, and insisted that Hawkinberry stop smoking, exercise regularly, and be more consistent in taking her medications.  Tr. at 732, 734, 737.

On October 3, 2007, Dr. Varrati permitted Hawkinberry to return to work without restrictions.  Tr. at 148.  Hawkinberry returned to regular work but stopped on January 21, 2008.  Tr. at 52, 148.  Hawkinberry testified at the hearing that she periodically stopped working during the winter months because there was less work available at that time and that she left her job because she agreed to resign as part of a resolution of her worker's compensation claim.  Tr. at 56.

Hawkinberry participated in outpatient counseling at Community Mental

3

Healthcare (CMH) and was prescribed medications for depression and anxiety.  Tr. at 267-71, 588-90, 669-94.

On August 25, 2008, Hawkinberry began a course of pain management with John Hill, M.D.  Tr. at 320-21.   Dr. Hill diagnosed Hawkinberry as suffering from lumbar radiculitis, cervical spondylosis, a displaced disc, and degenerative disc disease.  Tr. at 320, 322.  Dr. Hill's examination found Hawkinberry to be essentially normal, including 5/5 strength in upper and lower extremities and 2+ reflexes.  Hawkinberry also displayed good range of motion in the cervical and lumbar spine, although she had some discomfort upon moving.  Dr. Hill administered steroid injections to the lumbar spine and prescribed Zanaflex and Relafen at the initial meeting.  In subsequent visits during September and November, Dr. Hill administered further steroid injections and cervical facets blocks.  Tr. at 322-30.  Dr. Hill found that Hawkinberry responded well to the treatments and that they gave her temporary relief from pain.  Tr. at 322, 361, 364.

On December 8, 2008, Shirley Workman, APRN, wrote that Hawkinberry had been receiving treatment for depression at Community Mental Healthcare since 2003.  Tr. at 267.  According to Workman, Hawkinberry suffered from a mood disorder, rule out bipolar disease, with symptoms of depression, anxiety, mood swings, poor sleep, impaired focus and concentration, and anhedonia.  Workman described Hawkinberry as cooperative and compliant with treatment and opined that due to the severity of Hawkinberry's symptoms she was not capable of gainful employment at that time.  On May 18, 2009, Workman wrote a second letter describing Hawkinberry's condition.  Tr. at 588.  Workman stated that Hawkinberry had achieved limited progress and continued to express symptoms of depression and self-doubt, difficulty in making decisions, and

4

unhealthy management of stress by gambling.  According to Workman, Hawkinberry was compliant with treatment but "appears to have limited insight into the fact that she must be responsible for making changes in her life, if she hopes to decrease the symptoms of her depression and have improved confidence and self-esteem."  Tr. at 588.

On January 14, 2009, David R. Bousquet, M.Ed., examined Hawkinberry at the request of the Bureau of Disability Determination ("Bureau") and completed a Disability Evaluation Report assessing Hawkinberry's mental status.  Tr. at 331-40.  Hawkinberry reported that she did not always use her C-Pap machine for sleep apnea because it bothered her too much when she was trying to sleep and also reported that without medications she would be unable to sleep.  She stated that she cried two or three times a week and was not always aware of why she cried.  She reported that her energy, motivation, and enjoyment were low and that she frequently became depressed, moody, angry, and irritable.  According to Hawkinberry, her physician had not given her any limitations to her physical activities, but she suffered from chronic pain that worsens when she exerts herself.  Hawkinberry told Dr. Bousquet that sometimes the pain radiates into her arms and that she is easily fatigued and has difficulty lifting, kneeling, bending, and standing.  Hawkinberry also reported that she was taking psychotropic medications but had not seen much effect from them.

Dr. Bousquet found Hawkinberry to be cooperative and neat and clean in appearance.  She tended to be confused by some questions, which had to be reworded to ensure understanding, had some difficulties with awareness and insight, and was easily distracted during psychometric testing.  He regarded Hawkinberry's results as

5

reliable.  Her speech was understandable and her associations organized and concrete.
According to Dr. Bousquet, Hawkinberry's affect was appropriate but tended to be
primarily sad, with underlying features of anxiety.  He found Hawkinberry to be restless
and fidgety.  She reported elevated heartbeat when shortness of breath when
"nervous," said that she was frequently worried and anxious, and admitted that she had
occasional difficulties with memory.

Dr. Bousquet reported that Hawkinberry was fully oriented but displayed limited
insight into her overall functioning.  Reasoning and judgment were at age-appropriate
levels, although her ability to manage her financial affairs was impaired by her
predilection for gambling.

Hawkinberry stated that she lived in a mobile home with her husband, daughter,
and son and, temporarily, with an older daughter, her daughter's husband, and their two
children.  Her daily activities included cleaning the house and laundry.  Although she
had help with these chores, they take longer to accomplish than they used to take, and
they cause her increased pain.  House cleaning included washing floors and running a
sweeper.  She also watched television, played bingo, and gambled using the "skill
machines."  She rarely visited and occasionally attended church.  She had a driver's
license and a vehicle.

Hawkinberry scored in the borderline range on the WAIS-IV in Verbal
Comprehension, Perceptual Reasoning, and Processing Speed and scored in the low
average range in Working Memory.  Her full scale score was in the borderline range.
Dr. Bousquet stated, however, that Hawkinberry's problems with concentration and
attention along with her anxiety caused her scores to under-represent her actual

6

abilities.  He also noted higher scores when she took the WISC-R in 1982.  Dr. Bousquet opined that Hawkinberry's actual abilities probably fell in the low average range.

Dr. Bousquet diagnosed Hawkinberry as suffering from a recurrent major depressive disorder, an anxiety disorder with obsessive and compulsive features, and a somatoform disorder; he assigned her a Global Assessment of functioning ("GAF") of 55.[1]  He opined that she was not impaired in her ability to understand, remember, and follow simple instructions; was mildly impaired in her ability to maintain attention and concentration for simple and repetitive tasks; and was moderately impaired in her abilities to relate to others and to withstand ordinary stresses and pressures associated with day-to-day work activity.

Hawkinberry visited Dr. Hill on February 2, 2009, complaining of constant pain across her neck, trapezius muscles, back, upper buttocks, and knees, accompanied by some headaches.  Tr. at 384.  She rated the pain as five on a ten-point scale.  Dr. Hill noted that lumbar epidural injections had resolved her leg pain but that a series of cervical facet blocks had not helped her neck pain.  Hawkinberry exhibited a wide-stance gait, trigger points along the trapezius and paraspinal muscles, a positive Tinel in the left hand, and decrease range of motion in the cervical and lumbar spine secondary to pain.  Reflexes and extremity strength were normal.  Dr. Hill ordered an MRI of the lumbar spine.

------

[1] A GAF of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflict with peers of co-workers).

On February 17, 2009, Jennifer Swain, Psy.D., reviewed Hawkinberry's record at the request of the Bureau and completed a Psychiatric Review Technique and a Mental Residual Functional Capacity ("RFC") Assessment evaluating Hawkinberry's mental state and capabilities.  Tr. at 341-58.  Dr. Swain found that Hawkinberry suffered from a major depressive disorder, an anxiety disorder, and a somatoform disorder.  These resulted, according to Dr. Swain, in mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace.  Dr. Swain opined that Hawkinberry was moderately limited in her ability:  to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the workplace; and to travel in unfamiliar places or use public transportation.

Although treating sources at the Community Mental Health Center opined that Hawkinberry could not be gainfully employed, Dr. Swain found that the notes accompanying this opinion contradicted the opinion because they indicated that Hawkinberry appeared to be functioning adequately.  Dr. Swain then opined as follows:

The clmt retains the ability to sustain simple to more detailed tasks, which are

8

> commensurate with any physical limitations.  She can relate appropriately with others for brief, superficial interactions.  She would need relatively static duties where changes can be explained and there are no strict production demands.

Tr. at 358.  Dr. Swain found Hawkinberry's statements about her limitations to be partially credible.  On June 12, 2009, Katherine Lewis, Psy.D., reviewed Hawkinberry's file and affirmed Dr. Swain's assessments.

Hawkinberry visited Scott Holder, M.D., on March 2, 2009 for pain in her knees, especially in the right knee.  Tr. at 614.  Hawkinberry told Dr. Holder that she first noticed the pain when she was climbing a ladder and felt something pull.  She told him that now she has pain with squatting or bending and has difficulty walking.  She described the pain as moderately severe and worsening.  According to Hawkinberry, the pain worsened with activity and got better with rest.  X-rays showed essentially normal articular surfaces with no sign of any loose body.  Dr. Holder opined that Hawkinberry had probably suffered a meniscal tear of the right knee.  He prescribed ibuprofen and recommended an MRI.  Hawkinberry began a course of physical therapy for her right knee.

On March 2, 2009, Hawkinberry again visited Dr. Hill complaining of pain in her neck, lower back, and upper buttocks.  Tr. at 383.  She exhibited a decreased range of motion with pain in the lumbar spine.  Reflexes and extremity strength were normal.  Dr. Hill noted that he would order an MRI as soon as Hawkinberry's insurance problems were resolved.

On March 7, 2009, Hawkinberry underwent an MRI of her right knee.  Tr. at 367-68.  The MRI revealed evidence of chondromalacia patella, a small joint effusion, and mild osteoarthritic changes but no meniscal tear.  On May 11, 2009, Dr. Holder again

9

saw Hawkinberry regarding her knee pain.  Tr. at 612.  She reported that physical therapy had not significantly improved her knee pain.  Dr. Holder found good flexion and full extension.  Dr. Holder diagnosed mild knee degeneration and advised Hawkinberry to lose 40 pounds and participate in strengthening exercised to help her pain.  Dr. Holder also gave Hawkinberry an injection of Kenalog and Lidocaine into the anterior medial aspect of the right knee and continued her prescription for Diclofenac sodium for inflammation.

On March 23, 2009, Hawkinberry underwent an MRI of her lumbar spine.  Tr. at 386.  The MRI revealed normal alignment.  Generally, degenerative changes were mild except at the L4-5 level.  At that level, there was posterior disc bulging associated with an annular tear, although there was no extrusion of a disc fragment or canal stenosis.

On May 4, 2009, Hawkinberry again complained to Dr. Hill of pain in her neck, lower back, and upper buttocks.  Tr. at 381.  There was decreased range of motion with pain in her cervical and lumbar spine.  Dr. Hill's examination was otherwise normal.

On June 15, 2009, Hawkinberry again visited Dr. Holder.  Tr. at 611.  She reported some relief from pain after the knee injection but complained that the pain had started again two or three weeks earlier.  She also said that she had stopped taking Diclofenac.  Dr. Holder found good extension and flexion, and he opined that Hawkinberry was not ready for joint replacement or arthroscopy.  He again told Hawkinberry to lose weight, avoid bent knee activities, engage in straight-leg raising, and take Diclofenac.  In August, Hawkinberry noted some improvement, despite having gained four pounds. Tr. at 610.

Hawkinberry received an epidural steroid injection at the L3-4 level on August 25,

10

2009.  Tr. at 657.  She also received epidural injections at the L4-5 level on September 1 and 8, 2009.  Tr. at 651, 654.

On November 2, 2009, Dr. Hill indicated that Hawkinberry's medications included Percocet, Flexeril, Clonazepam, and Lyrica.  Tr. at 755.  Dr. Hill added baclofen for muscle spasms to Hawkinberry's medications and a TENS unit on January 4, 2010.  Tr. at 754.

On December 9, 2009, Mark Pellegrino, M.D., diagnosed Hawkinberry as suffering from fibromylagia in addition to her cervical and lumber problems.  Tr. at 722. He prescribed Lyrica and recommended physical therapy.  Upon a follow-up visit on January 11, 2010, Dr. Pellegrino noted that Hawkinberry denied depression and that gait and balance were normal.  However, there was pain upon palpation at multiple sites.  He substituted Cymbalta for Paxil.

Hawkinberry underwent an MRI of her cervical spine on March 1, 2010.  Tr. at 710.  The interpreting physician's impression was central and right paramedian protrusion of the C3-4 disc causing mild cord indentation; central and right paramedian protrusion of the C4-5 disc flattening the adjacent cord; central and right paramedian disc causing mild flattening of the right side of the cord at C5-6; and right paramedian disc protrusion at C6-7 flattening the right side of the cord.

On March 8, 2010, Hawkinberry visited Dr. Hill complaining of neck pain, secondary headaches, muscle pain, and low back pain radiating into her left posterior thigh.  Tr. at 752.  Hawkinberry described the pain as though "someone is pinching her neck a lot, just a knot in her low back and she also feels kind of cloudy, hard time thinking, feels sleepy."  Tr. at 752.  Hawkinberry had stopped taking Lyrica and

11

baclofen, and Dr. Hill also stopped her Percocet.  Continued medications included Xanax, Protonix, Ambien, paroxetine, and Prandin.  Upon examination, Dr. Hill noted that Hawkinberry's appearance, orientation, and affect were appropriate; gait was normal; heart was regular; and lungs clear.  In addition, sensation was grossly intact in upper and lower extremities; reflexes were 2+ throughout; strength in all extremities was 5/5; and range of motion was good in the cervical lumbar spine.  Dr. Hill detected diffuse muscle tenderness in at least 10-11 points in the paraspinous muscles, trapezius muscles, anterior spine, thighs, and knees.  The straight leg test was negative.  Dr. Hill diagnosed lumbar degenerative disc disease with cervical spondylosis, and a displaced disc.  He also noted that her examination and history were consistent with fibromyalgia.

On April 5, 2010, Hawkinberry visited Dr. Hill complaining of an achy "pulling away feeling" in her neck, shoulders, low back, and occasionally down her legs and into her feet.  Tr. at 751.  Hawkinberry rated the pain as five on a scale of ten.  According to Hawkinberry, the pain was intermittent, and she described the TENS unit as helpful. Hawkinberry reported that she was still smoking two packs of cigarettes a day, and she reported experiencing depression and anxiety.  Physical examination revealed no abnormalities except diffuse muscle tenderness, positive back pain with a straight leg raise, and increased pain with a range of motion in the lumbar and cervical spine.  Dr. Hill's diagnosis included fibromyalgia.  He also noted that Hawkinberry had stopped taking Savella as too expensive, and he prescribed Celebrex for pain and Zanaflex.  He also prescribed physical therapy three times a week for 12 weeks.

On July 13, 2010, Hawkinberry saw Dr. Holder complaining of bilateral knee pain. Tr. at 760.  Dr. Holder again prescribed Diclofenac.

On July 19, 2010, Hawkinberry visited Jerome Yokiel, M.D., at the pain management center.  Tr. at 750.  Dr. Yokiel noted that Hawkinberry reported chronic cervical and lumbar pain, daytime sedation upon taking Lyrica, and no alleviation from Celebrex.  She also reported that her back seemed worse.  Dr. Yokiel also found tenderness in the mid lumbar and mid cervical regions and in the trapezius bilaterally, pain with a range of motion of the lumbosacral spine, and pain upon straight leg raising bilaterally.  Dr. Yokiel prescribed Neurontin and Vicodin.

Hawkinberry consistently stated in counseling at CMH that she was experiencing a great deal of stress, largely because her adult children and grandchildren were living at home and causing increased work.  Tr. at 675-84.  In August 2010, Hawkinberry stopped counseling and began visiting CMH for medications only.

Hawkinberry was examined by Ramana Podugu, M.D., a cardiologist, on October 13, 2010 upon reference from Dr. Joseph Bryan.  Tr. at 732-34.  Hawkinberry had reported chest heaviness and pain radiating down her arms.  Testing showed an ejection fraction of 55%, and Dr. Podugu detected a soft murmur.  He recommended heart catheterization and an echocariogram.  In his clinical notes, Dr. Podugu noted that Hawkinberry "does not maintain compliance with her medications.  She goes off and on her medications as suits her symptoms."  Tr. at 732. He particularly noted this tendency with respect to Hawkinberry's C-Pap device.

On October 25, 2010, Hawkinberry again saw Dr. Yokiel and complained of chronic back pain radiating down into her extremities.  Tr. at 749.  Hawkinberry stated that her Vicodin was not helping.  Dr. Yokiel found tenderness to palpation in the lumbar region, pain with a range of motion in the lumbosacral spine, and increased pain upon

13

straight leg raising bilaterally.  Dr. Yokiel switched Hawkinberry's Vicodin to oxycodone and continued her other medications.

On December 28, 2010, Hawkinberry visit William V. Swoger, D.O., for an examination preliminary to surgery to remove a cyst from her right ovary.  Tr. at 738-39.  Dr. Swoger noted that Hawkinberry was on Advair and that she had been diagnosed with a fatty liver, diverticulitis, dysuria, diabetes mellitus type 2, and hypertension.  He also noted that Hawkinberry was smoking two packs of cigarettes a day.  Df. Swoger found no weakness, fatigue, palpitations, tachycardia, irregular chest pain, discomfort, joint pains, aches, loss of strength, sleep disturbance, moodiness, depression, or anxiety.  Auscultation of Hawkinberry's lungs revealed scant expiratory wheezes.  Dr. Swoger advised Hawkinberry to stop smoking.  On March 7, 2011, a nurse interviewed Hawkinberry on behalf of Dr. Swoger.  Tr. at 740-41.  Hawkinberry stated that she had not been using her Advair but was using duonab at least once a day.  She denied chest pain or an increase in wheezing, but she complained of coughing, shortness of breath, and a continuation of her previous level of wheezing.  Hawkinberry exhibited a full range of motion in her neck and extremities and a normal gait.  The nurse told Hawkinberry to be compliant with her medications and to stop smoking.

Hawkinberry visited the pain management center on January 31, 2011 complaining of chronic cervical pain and chronic lumbar pain.  Tr. at 748.  She noted that the pain was better upon taking oxycodone four times a day but that she was having trouble sleeping.  Dr. Yokiel found tenderness to palpation in the midline cervical and lumbar regions.  He changed Hawkinberry's Ambien to Restoril.

On March 3, 2011 Hawkinberry visited Mark R. Grubb, M.D., complaining of neck

14

pain and pain on her left side accompanied by numbness and tingling.  Tr. at 709.

Hawkinberry reported that the pain had been growing worse over the years, particularly

over the past six months, and Dr. Grubb reviewed the various treatments she had

undergone for pain.  He also noted that Hawkinberry was currently taking oxycodone,

Zanaflex, and anti-inflammatory medications.  Examination was normal except revealing

diminished range of motion in the neck and a positive Spurling's maneuver.  After Dr.

Grubb reviewed Hawkinberry's March 1, 2010 MRI with her and discussed her options,

Hawkinberry leaned toward surgery.  Dr. Grubb said that he would begin the paperwork

for the procedure.

Hawkinberry again visited Dr. Holder on April 1, 2011 complaining of bilateral

knee pain.  Tr. at 761.  She told Dr. Holder that although she had felt 50% better on

Diclofenac, she had run out of that prescription and was now suffering recurrent knee

pain.  Dr. Holder found tenderness over the medial joint line and medial facet of the

patella and mild discomfort with patellofemoral compression.  There was pain with

McMurray's maneuver but no varus, valgus laxity, or effusion.  Dr. Holder renewed her

prescription for Diclofenac and ordered an MRI to rule out a meniscal tear.  He also

noted that Hawkinberry has tried strengthening exercises in the course of anti-

inflammatory medication.  On April 6, 2011, an MRI of Hawkinberry's right knee showed

no meniscal or ligament tear.   Tr. at 764.

On April 18, 2011, Hawkinberry vsited Dr. Holder complaining of knee pain.  Tr.

at 764.  She had stopped taking her Diclofenac preliminary to surgery.  Dr. Holder

recommended continuing the Diclofenac after surgery, exercising at home, and taking

Tylenol.  He noted that he would consider knee injections if discomfort continued.

On May 9, 2011, Dr. Grubb performed an anterior cervical discectomy and fusion on Hawkinberry at the C5-6 and C6-7 levels.  Tr. at 758-59.  There were no complications.  Dr. Grubb examined Hawkinberry on May 24, 2011.  Tr. at 757.  She was doing somewhat better but still reported some neck pain and upper extremity symptoms.  Her incision site was good, and she had good upper extremity strength.  Dr. Grubb recommended increased activity and wearing a bone stimulator and a cervical collar.

C.    Hearing testimony

At the June 14, 2011 hearing, Hawkinberry testified that she worked as a sash builder from 1995 to 2008 except for a period in the early 2000s when she had to stay home to raise children.  Tr. at 52-53.  She stopped working in 2010 when, as part of a settlement of a worker's compensation claim involving a neck injury, she agreed to resign from her job.  Tr. 56.  She described her neck symptoms as headaches, pinching and burning sensations in the back of her neck, and muscle pain in the shoulders.  Tr. at 55-56.  According to Hawkinberry, lifting worsens the pain, and painkillers, muscle relaxants, and her TENS unit help alleviate the pain but do not completely relieve it.  On an average day, Hawkinberry testified, her pain is an eight on a scale of ten.  She told the ALJ that her current medications included Celebrex, Ambien, Lasix, Cymbalta, and a diabetes medication and that most of her medications caused drowsiness about a half hour after taking them and lasting for one hour.  Tr. at 59.  Hawkinberry also said that, on occasion, her pain radiates from her neck into her arms and that this was happening more frequently since her surgery.  Tr. at 59-60.  She denied experiencing any weakness or loss of strength in her arms.  Tr. at 60.

16

Hawkinberry also testified that she had problems with carpal tunnel syndrome in both hands. Tr. at 61. She said that she had surgery on the right hand about 2003 or 2004 and never had surgery on the left hand. According to Hawkinberry, the main symptom resulting from her carpal tunnel syndrome was a tendency for her hands to go numb with continuous use. Hawkinberry testified that when the numbness occurs, it takes about 10 or 20 minutes to wear off. Tr. at 61.

Hawkinberry also testified that she suffered from knee pain, particularly in the right knee. Tr. at 62. She said that these were being treated with medication, although surgery was a possibility in the future. Tr. at 63.

With respect to her low back pain, Hawkinberry told the court that the pain radiates into her buttocks and leg, usually on the left side. Tr. at 63. Hawkinberry said that she did not have back pain every day. Tr. at 64. She also said that she suffered from fibromylagia and was taking medication for it, although she added that her doctor was going to talk to her about exercise once she recovered from her surgery. Tr. at 64.

Hawkinberry also testified that she suffered from shortness of breath a few times a day, either when moving or when she is still. Tr. at 64-65. She said she uses Advair and a nebulizer and, when asked, admitted that she was still smoking about a pack a day. Tr. at 65-66.

Hawkinberry told the court that on an average day she gets up in the late morning, takes her medications, watches TV or uses the computer and, on good days, cleans, does dishes, or does laundry. Tr. at 66-67. She also cooks simple meals of oven-ready food. Tr. at 71. If she is having a bad day, she sleeps or sits. Usually, she watches three or four hours of television a day. Tr. at 67. Hawkinberry testified that she

17

does her own food shopping and, until recently, played bingo.  Tr. at 68-69.  When she shops, however, someone comes with her to help lift heavier food items and bring groceries into the house.  Tr. at 71.  She has no problems with walking except that she becomes short of breath after walking a block or more.  Tr. at 69.  Some days, Hawkinberry said, she has trouble sitting and has to keep changing her position.  Tr. at 69-70.  She also told the court that although her headaches stopped immediately after her surgery, recently they had been coming back.  Tr. at 70.

Hawkinberry testified that on bad days she might be tired and drowsy from the medicine, suffering from particularly severe pain, or suffering from diarrhea, vomiting, or depression.  Tr. at 72.

The ALJ asked the VE to assume a hypothetical individual with Hawkinberry's age, education, work experience, limited to the light exertional level but only able occasionally to climb ramps or stairs and never ladders, ropes, or scaffolds; and able occasionally to balance, stoop, kneel, crouch, and crawl.  Tr. at 75. The individual must also avoid hazards, such as heights or dangerous machinery, and must avoid concentrated exposure to extreme temperatures, humidity, fumes, odors, gases, or other respiratory irritants.  Tr. at 75. Moreover, the individual would be limited to simple and routine work with brief superficial interaction with others in a static environment with no strict production quotas or demands and be allowed a sit/stand option.  Tr. at 75, 78. When asked, the VE said that these limitations would preclude the individual from doing Hawkinberry's previous work but that there would be work in the national economy for that individual.  Tr. at 75. The available work included electronics worker, mail clerk, and assembler of electrical accessories.  Tr. at 75-76.

18

The ALJ then changed the hypothetical question to posit an individual limited to sedentary work.  Tr. at 77. When asked if there was work for such an individual, the ALJ responded that such an individual could work as a document preparer, patcher, and inspector of wooden products, among others.  Tr. at 77-78. These jobs would remain if the individual could use her hands bilaterally frequently, but no jobs would remain if the individual could only use her hands occasionally.  Tr. at 78.  The VE also testified that any individual missing three or more days a month would eventually be fired and, therefore, would not be employable.  Tr. at 79.

### III.  Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  Second,  the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  Third, if the

19

claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

IV.  Summary of Commissioner's Decision

In determining that Hawkinberry was not disabled, the ALJ made the following relevant findings:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

2.  The claimant has not engaged in substantial gainful activity since January 21, 2008, the alleged onset date.

3.  The claimant has the following severe impairments: patellofemoral pain syndrome; lumbar disc degeneration and radiculitis; cervical spondylosis, displaced discs, and degenerative disc disease; fibromyalgia; sleep apnea and chronic obstructive pulmonary disease (COPD); obesity; and major depressive disorder, anxiety disorder, and somatoform disorder.

4.  The claimant does not have an impairment or combination or impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that she is further limited as follows:
- She can never climb ladders, ropes or scaffolds;
- She can only occasionally climb stairs and ramps, balance, stoop,

20

kneel, crouch, or crawl;
- She must avoid all exposure to hazards, such as unprotected heights and dangerous machinery;
- She must avoid concentrated exposure to extreme temperatures and humidity, fumes, odors, dust, gases, and similar respiratory irritants;
- She is further limited to performing simple and routine work; and
- She can have only brief, superficial interaction with others, in a static environment with no strict production quotas or demands.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on January 21, 1969 and was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability as defined in the Social Security Act, from January 21, 2008, through the date of this decision.

Tr. at 21-33 (citations omitted).

## V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied.  *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been

defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

VI.  Analysis

Hawkinberry alleges that the ALJ erred because substantial evidence does not support the conclusion that Hawkinberry can sustain work activity and is not disabled. The Commissioner denies that the ALJ erred.

Hawkinberry makes two arguments in support of her contention that the evidence does not support the ALJ's decision.  First. she argues that the ALJ failed to consider the effects of Hawkinberry's medications in assessing her RFC.  As Hawkinberry notes, the ALJ must consider the side effects of a claimant's medications in assessing the claimant's capacity for work.  *See* SSR 96-7p.  Hawkinberry testified that about 30 minutes after taking her medications, she becomes drowsy for about an hour and usually lays down.  According to Hawkinberry, this testimony is supported by Dr. Hill's clinical notes of March 8, 2010, in which he noted that Hawkinberry complained that she "feels kind of cloudy, hard time thinking, feels sleepy." (Tr. 752).

A claimant's allegations that the side effects of medications impair the claimant's ability to work must be supported by objective evidence.  *See Farhart v. Sec'y of Health and Human Servs.*, 1992 WL 174540, at *3 (6th Cir. 1992).  In the present case, as in *Farhart*, "[t]here is no objective medical evidence supporting Farhat's allegations that the medicine makes him so drowsy and requires him to rest to such an extent that he is unable to work."  *Id.*  With respect to Dr. Hill's clinical note of March 8, 2010, Dr. Hill

22

responded to Hawkinberry's complaints of sleepiness by stopping her prescription for Percocet and continuing Xanax, Protonix, Ambien, paroxetine, and Prandin.  There is no indication in clinical notes in the record of further complaints of sleepiness due to medications after this change.  Consequently, Hawkinberry's contention that her medications make her too sleepy to work are not supported by objective evidence.  The ALJ's opinion, therefore, is not contradicted by the record in this respect.

Hawkinberry also asserts that the ALJ's determination that Hawkinberry was not entirely credible is unsupported by substantial evidence.  Credibility determinations regarding a claimant's subjective symptoms rest with the ALJ.  *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009).  "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Nevertheless, social security regulations constrain the ALJ's analysis and determination of a claimant's credibility.  In particular, 20 C.F.R. § 416.929(a) and SSR 96-7p, 1996 WL 374186, describe a two-step process by which an ALJ must proceed in ascertaining the degree to which a claimant's statements about her subjective symptoms are credible.  *See also Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 246-47 (6th Cir. 2007).  First, an ALJ must determine whether the there is an underlying medically determinable physical impairment that could be expected to produce the claimant's alleged symptoms.  20 C.F.R. § 416.929(a); 96-7p, 1996 WL 374186 at *2.  Second, if the ALJ finds that the claimant suffers from an underlying impairment which could produce such symptoms, the ALJ must evaluate the actual

intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities.  *Id.*  In making this evaluation, the ALJ must consider the claimant's daily activities; the location, duration, frequency, and intensity of symptoms; factors that precipitate and aggravate symptoms; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; other treatment undertaken to relieve symptoms; other measures taken to relieve symptoms; and any other factors bearing on claimant's limitations in performing basic functions.

The ALJ looked at almost all of the required factors in determining that Hawkinberry was less than fully credible.  He discussed Hawkinberry's daily activities; the location, duration, frequency, and intensity of her symptoms; factors that precipitate and aggravate symptoms; the type, dosage, and effectiveness of her medication; and other treatment undertaken to relieve her symptoms.  *See* tr. at 25-31.  In asserting that the ALJ's credibility determination is not supported by substantial evidence, Hawkinberry makes the following argument in support:

> In evaluating Ms. Hawkinberry's credibility, the ALJ cited an office note dated March 7, 2011 (Tr. 740) from her physician indicating that Mr. Hawkinberry's "general health is good". (Tr. 27).  The office note was from her family physician and the visit was for the purpose of medical clearance for her cervical surgery. (Tr. 740).  Would one expect Ms. Hawkinberry to go into detail regarding her orthopaedic impairments with her family physician when she has a pain management physician and she is scheduled for surgery in less than a month?
> The ALJ cites the record wherein it is indicated that Ms. Hawkinberry was noncompliant with her medication. (Tr. 29, 761).  However, the ALJ fails to address the litany of Ms. Hawkinberry's prescription medications and her testimony as to the side effects of said medications.

Plaintiff's brief at 10.

As the Commissioner correctly responds, the ALJ did not base his opinion that Hawkinberry was not entirely credible merely upon Hawkinberry's March 7, 2011 report

24

to a nurse on behalf of Dr. Swoger.  In assessing Hawkinberry's credibility, the ALJ noted the lack of objective medical evidence generally for the severity of her symptoms, contrasted her hearing testimony regarding constant, recurring headaches to her statements to her physicians regarding the severity and frequency of headaches, noted Hawkinberry's claim at her hearing of everyday pain of eight on a ten point scale versus much lesser degrees of everyday pain reported to her physicians, and compared her degree of limitation claimed at the hearing to the daily activities reported to her physicians.  Tr. at 28-29.  Even if it was reasonable for Hawkinberry to tell the nurse on March 7, 2011 that her general health was good despite serious health problems, other evidence in the record cited by the ALJ provides substantial support for his determination that Hawkinberry's statements regarding her limitations were less than fully credible.

Similarly, there was substantial evidence in the record that Hawkinberry was not compliant with treatment recommendation irrespective of the side effects of prescribed medications.  Most notably, as remarked by the ALJ, there were repeated notations in the record that Hawkinberry was not compliant with her C-Pap device and failed to use her Advair inhaler.  In addition, as noted by the ALJ, Hawkinberry was not compliant with dietary advice or with repeated demands that she stop smoking.  As Dr. Podugu noted, Hawkinberry "does not maintain compliance with her medications.  She goes off and on her medications as suits her symptoms."  Tr. at 732.  Thus, whether side effects caused Hawkinberry to be noncomplaint with some medications, such as Percocet or Declofenac, there is substantial evidence in the record that Hawkinberry generally failed to comply with recommended treatment, and the ALJ cited that evidence.  Tr. at 29.

25

Consequently, the court rejects Hawkinberry's contention that substantial evidence does not support the ALJ's finding that she was not compliant with treatment recommendations.

The Commissioner followed the two-step procedure for assessing credibility and considered almost all of the factors relevant to such an assessment.  The ALJ's assessment of Hawkinberry's credibility, therefore, is supported by substantial evidence.  Hawkinberry's arguments that the ALJ erred in assessing her credibility are without merit.

VII.  Conclusion

For the reasons given above, the decision of the Commissioner is AFFIRMED.


Date:  January 4, 2012                         s/ *Nancy A. Vecchiarelli*
                                               Nancy A. Vecchiarelli
                                               U.S. Magistrate Judge